# TEKER CIVILLE TORRES & TANG, PLLC
SUITE 200, 330 HERNAN CORTEZ AVENUE
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 477-9891/472-8868
FACSIMILE: (671) 472-2601/477-2511

*Attorneys for Defendant*
*Citibank, N.A.*



FILED
DISTRICT COURT OF GUAM

JUN 11 2003

MARY L. M. MORAN
CLERK OF COURT

4

## IN THE DISTRICT COURT OF GUAM

## TERRITORY OF GUAM

| | |
|---|---|
| TAKAI'S ENTERPRISE, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>CITIBANK, N.A. (GUAM) and )<br>DOES 1-10, inclusive. )<br>)<br>Defendants )<br>—————————————————————) | CIVIL CASE NO. 03-00015<br><br>**MEMORANDUM AND POINTS OF AUTHORITY IN SUPPORT OF DEFENDANT CITIBANK, N.A.'S MOTION TO DISMISS** |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................... 1

II.   RULE 12(B)(6) STANDARD .......................................... 2

III.  ARGUMENT ......................................................... 3

    A.    The Complaint Fails to State a Claim under the
        Expedited Funds Availability Act ................................... 3

    B.    This Court Continues To Have Jurisdiction
        Even After Dismissal of EFAA Claims ........................... 10

    C.    Plaintiff's Common Law Claims Fail To State
        Causes Of Action Upon Which Relief Can Be Granted ............... 13

IV.  CONCLUSION ....................................................... 18

i

# TABLE OF AUTHORITIES

**Page**

## Cases

*Arntz Contracting Co. v. St. Paul Fire and Marine Ins. Co.,*
54 Cal. Rptr.2d 888 (Cal. Ct. App. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Banco De La Provincia De Buenos Aires v. Baybank Boston N.A.,*
985 F. Supp. 364 (S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Bank One Chicago, N.A. v. Midwest Bank & Trust Co.,*
516 U.S. 264, 116 S.Ct. 637 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Bronx Chrysler Plymouth, Inc. v. Chrysler Corp.,*
212 F. Supp.2d 233, 249 n. 10  (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Cahaba Seafood, Inc. v. Central Bank of the South,*
567 So.2d 1304 (Ala. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Cates Construction, Inc. v. Talbot Partners,*
980 P.2d 407, 86 Cal.Rptr.2d 855 (Cal. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17

*Conjugal Soc. Composed of Juvenal Rosa v. Chicago Title Ins. Co.,*
690 F.2d 1 (1st Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Digital & Analog Design Corp. v. North Supply Co.,*
540 N.E.2d 1358 (Ohio 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Dynamic Image Technologies, Inc. v. U.S.,*
221 F.3d 34, 37 n.2 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Erlich v. Menezes,*
981 P.2d 978, 87 Cal.Rptr.2d 886  (Cal. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

*First Federal Sav. and Loan Ass'n of Puerto Rico v. Ruiz De Jesus,*
644 F.2d 910 (1st Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Foley v. Interactive Data Corp.,*
765 P.2d 373, 254 Cal.Rptr. 211 (Cal. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Freeman & Mills, Inc. v. Belcher Oil Co.,*
900 P.2d 669, 44 Cal. Rptr.2d 420 (Cal. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Case 1:03-cv-00015     Document 5     Filed 06/11/2003     Page 3 of 38

*Glazer v. Chandler*, 200 A.2d 416, 418 (Pa. 1964) ................................ 16

*Herman Family Revocable Trust v. Teddy Bear*,
    254 F.3d 802 (9th Cir. 2001) ........................................... 11

*In re Lloyd's American Trust Fund Litigation*,
    928 F.Supp. 333 (S.D.N.Y. 1996) ...................................... 12

*Khoury v. Maly's of California, Inc.*,
    17 Cal. Rptr.2d 708 (Cal. Ct. App. 1993) ................................. 16

*McNeill v. Security Ben. Life Ins. Co.*,
    28 F.3d 891, 894 n.4 (8th Cir. 1994) ................................... 16

*Nacional Financiera, S.N.C. v. The Chase Manhattan Bank, N.A.*,
    No. 00 CIV 1571 JSM, 2001 WL 327159,
        at *3 (S.D.N.Y. April 4, 2001) ................................... 12

*Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001) ................................... 2

*Quantum Associates, Inc. v. Symbol Technologies, Inc.*,
    No. C 01-02789 CRB, 2002 WL 1735356, at *1
        (N.D. Cal. July 12, 2002) ...................................... 15

*Rodriguez v. International Business Machines*,
    960 F.Supp. 227 (N.D. Cal. 1997) ...................................... 15

*Scarfo v. Ginsberg*, 175 F.3d 957 (11th Cir. 1999),
    *cert. denied*, 529 U.S. 1003, 120 S.Ct. 1267 (2000) ......................... 11

*Scott v. Pasadena Unified School* Dist.,
    306 F.3d 646 (9th Cir. 2002),
    *cert. denied*, 123 S.Ct. 2071 (May 19, 2003) ............................. 11

*Stanford Ranch, Inc. v. Maryland Casualty Company*,
    89 F.3d 618 (9th Cir. 1996) ........................................... 13

*Van Buskirk v. Cable News Network, Inc.*,
    284 F.3d 977 (9th Cir. 2002) ........................................... 2

*Whitmire v. Arizona*,
    298 F.3d 1134 (9th Cir. 2002) .......................................... 2

**Statutes**

12 U.S.C. § 632 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-13

12 U.S.C. § 1010(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

12 U.S.C. §§ 4001-4010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-10
   § 4001(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   § 4001(21) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 9
   § 4001(23) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 9
   § 4002(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   § 4002(a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
   § 4002(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   § 4002(b)(1)-(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   § 4002(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9
   § 4007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
   § 4007(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

28 U.S.C. § 1367(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**Rules**

FRCP 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

**Other Authorities**

132 Cong. Rec. H72-03 (daily ed. Jan, 23, 1986) (statement of Rep. De Lugo) . . . . . . . . . . . 9

141 Cong. Rec. H5738-02, 1995 WL 340515
  (daily ed. June 8, 1995) (statement of Rep. Faleomavaega) . . . . . . . . . . . . . . . . . 9, 10

62 Fed. Reg. 13801, 13807 (March 24, 1997)
  (amendments to 12 C.F.R. Part 229) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

Regulation CC, 12 CFR Part. 229 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-6

H.R. Conf. Rep. 100-261, at 179 (July 31,1987),
  *reprinted in* 1987 U.S.C.C.A.N. 588, 648 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

iv

# I.

## INTRODUCTION

Takai's Enterprises is a former customer of the Guam branch of Citibank, N.A. ("Citibank") and claims that the Guam branch of Citibank wrongfully refused to process wire transfer requests submitted by the Plaintiff's president, Koichi Takai, *see* Complaint ¶¶ 7-16, and at one point refused to permit Plaintiff's president to withdraw funds from Plaintiff's account, Complaint ¶¶ 17-19, although Plaintiff alleges that Citibank did release the funds later the same day, *id.*, ¶¶ 20-21. There appear to be two classes of claims in the Complaint. The first class is set forth in the First Claim for Relief in which Plaintiff alleges that Citibank violated the Expedited Funds Availability Act, 12 U.S.C. § 4002(a)(1)(B). The second class arises out of Citibank's allegedly wrongful failure to make the requested wire transfers and forms the basis for a variety of common law claims set forth in the Second, Third, Fourth, Fifth and Sixth Claims for Relief.

The allegations in the Complaint are utterly without merit and Citibank will if necessary, and at the appropriate time, answer and deny all allegations of wrongdoing. Before answering, however, Citibank seeks the dismissal of all counts of the Complaint under FRCP 12(b)(6) on the grounds that the Plaintiff has failed to state any cause of action upon which relief can be granted. As explained in detail below, the Expedited Funds Availability Act (which Plaintiff alleges to be the basis for federal question jurisdiction) does not apply to Guam banks and Plaintiff cannot state a claim under that Act.

Plaintiff's common law tort claims set out in Counts Two through Six also fail to state causes of action upon which relief can be granted. All of the Plaintiff's common law claims arise

1

from Citibank's alleged breach of what Plaintiff claims was Citibank's agreement to process wire transfer requests. *See* Complaint ¶¶ 11-16, 37-64. While the Complaint, read as a whole, arguably sets forth facts which, if true, might give rise to claims for breach of contract, the Plaintiff fails to allege facts which would convert any breach of contract claim it might arguably have into tort claims.

## II.

### RULE 12(B)(6) STANDARD

Federal Rule of Civil Procedure 12(b)(6) authorizes a court to dismiss a claim if the complaint fails to allege facts upon which relief can be granted. The purpose of a Rule 12(b)(6) motion is to test the legal sufficiency of a claim. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "Ordinarily, a court may look only at the face of the complaint to decide a motion to dismiss." *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002). "In deciding such a motion, all material allegations of the complaint are accepted as true, as well as all reasonable inferences to be drawn from them," *Navarro, supra*, and "[d]ismissal is proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *Ibid.* S*ee also, Whitmire v. Arizona*, 298 F.3d 1134, 1136 (9th Cir. 2002) (A "district court may grant a motion to dismiss for failure to state a claim only if it is clear that no relief can be granted under any set of facts that could be proved consistent with the allegations").

2

## III.

## ARGUMENT

**A.   The Complaint Fails to State a Claim under the Expedited Funds Availability Act.**

Plaintiff's First Claim for Relief is based on Citibank's alleged failure to make funds electronically transferred to Plaintiff's account with Citibank available for withdrawal in accordance with the Expedited Funds Availability Act, 12 U.S.C. §§ 4001-4010. *See* Complaint, ¶¶ 22-34.  The EFAA, however, does not apply to Citibank's office on Guam. The EFAA  is "a 1987 law designed to accelerate the availability of funds to bank depositors and to improve the Nation's check payment system." *Bank One Chicago, N.A. v. Midwest Bank & Trust Co.*, 516 U.S. 264, 266, 116 S.Ct. 637, 639 (1996).    The Federal Reserve Board has implemented the EFAA  through Regulation CC, 12 CFR pt. 229 (2002). *Bank One Chicago,* 516 U.S. at 268, 116 S.Ct. at 640.  Regulation CC is divided into three subparts: Subpart A - General; Subpart B - Availability of Funds and Disclosure of Fund Availability Policies; and, Subpart C - Collection of Checks.

The EFAA  provides, in relevant part, that

> Except as provided in subsection (e) of this section and in section 4003 of this title, in any case in which--
>
> **(A)** any cash is deposited in an account at a receiving depository institution[1] staffed by individuals employed by such institution, or
>
> **(B)** funds are received by a depository institution by wire transfer for deposit in an account at such institution,

---

[1]  "The term 'account' means a demand deposit account or other similar transaction account at a depository institution." 12 U.S.C. § 4001(1).  The term "depository institution" is defined in the EFAA as having "the meaning given such term in clauses (i) through (vi) of section 461(b)(1)(A) of this title [Title 12 U.S.C].

3

such cash or funds shall be available for withdrawal not later than the business day after the business day on which such cash is deposited or such funds are received for deposit. 12 U.S.C. § 4002(a)(1).

The EFAA, however, contains explicitly limited definition of "State", to "mean[] any State, the District of Columbia, the Commonwealth of Puerto Rico, or the Virgin Islands," 12 U.S.C. § 4001(21), and "United States" to mean "the several States, the District of Columbia, the Commonwealth of Puerto Rico, and the Virgin Islands." 12 U.S.C. § 4001(23). These definitions, which on their face do not include Guam, have been interpreted as limiting the applicability of the EFAA to offices located in the "United States" as defined in the EFAA. Regulation CC sets out a seven part test in defining what is a covered "Bank", but closes with the following limitation which effectively excludes the Guam offices of banks otherwise covered by the Act:

> For purposes of subpart C of this part and, in connection therewith, this subpart A, the term bank also includes any person engaged in the business of banking, as well as a Federal Reserve Bank, a Federal Home Loan Bank, and a state or unit of general local government to the extent that the state or unit of general local government acts as a paying bank. Unless otherwise specified, the term bank includes all of a bank's offices in the United States, but not offices located outside the United States.

12 C.F.R. § 229.2(e) (emphasis added).

Regulation CC also follows the definitions of "United States" provided for in the EFAA. The Regulation defines "United States" to "mean[] the states, including the District of Columbia, the U.S. Virgin Islands, and Puerto Rico," 12 C.F.R. § 229.2(jj), and "State" to "mean[s] a state, the District of Columbia, Puerto Rico, or the U.S. Virgin Islands" 12 C.F.R. § 229.2(ff).

In Subpart C of Regulation CC dealing with the Collection of Checks, special rules are set forth for checks payable through banks in Guam, American Samoa and the Northern Mariana

4

Islands (collectively referred to as "Pacific Islands Banks"). 12 C.F.R. § 229.43. This regulation was necessitated, according to the Federal Reserve Board, because these banks were not included within the definition of banks in the Act:

> Checks payable in Guam, American Samoa, and the Northern Mariana Islands (section 229.43). The Board has received inquiries as to the applicability of Regulation CC to checks drawn on depository institutions located in Guam, American Samoa, and the Northern Mariana Islands ("Pacific island banks"). For purposes of the Board's Regulation J, which governs collection of checks through Federal Reserve Banks, Pacific island banks are deemed to be in the Twelfth Federal Reserve District. Some checks drawn on these institutions ("Pacific island checks") bear U.S. routing numbers and are generally handled by banks in the U.S. in the same manner as other checks.
>
> **Because the Act does not include Guam, American Samoa, or the Northern Mariana Islands in the definition of "United States," Pacific island banks are not "banks" and Pacific island checks are not "checks" as defined in Regulation CC.** Banks often handle Pacific island checks in the same manner as other checks, however. The Board believes that applying some of the provisions of subpart C to Pacific island checks would provide an appropriate legal framework for the handling of these checks. The Board proposed to add a new § 229.43 to the regulation and accompanying commentary to set forth the provisions of subpart C that apply to checks drawn on Pacific island banks. (Emphasis supplied)

Availability of Funds and Collection of Checks, 62 Fed. Reg. 13801, 13807 (March 24, 1997) (amendments to 12 C.F.R. Part 229).

12 C.F.R. Part 229.43 applies to banks within the United States and their handling of checks payable in Guam, American Samoa, and the Northern Mariana Islands. It provides that "(1) Pacific island bank means an office of an institution that would be a bank as defined in § 229.2(e) but for the fact that the office is located in Guam, American Samoa, or the Northern Mariana Islands." 12 C.F.R. § 229.43(a)(1). Section 229.43(a)(2) directs that a "Pacific Island check means a demand draft drawn on or payable through or at a Pacific island bank, which is not

5

a check as defined in § 229.2(k)." The regulation does not purport to regulate the handling of checks payable in the "United States" by banks in Guam, American Samoa, and the Northern Mariana Islands, nor could it under the Act.

In addition to the restrictive definitions of "United States" and "State" as outlined above, there is other clear evidence that the availability of funds provisions in the EFAA do not apply to banks on Guam, including the following.

Appendix A to Regulation CC, 12 C.F.R. Pt. 229, App. A., contains routing numbers for next-day availability checks and local checks. When promulgating Regulation CC in 1988, the Board deleted routing numbers for Guam, Saipan and other Pacific locations. The Board observed that "A branch of a bank located in Guam pointed out that Appendix A contained the routing numbers 1214 and 3214 for Guam, Saipan and Pacific locations. Because these locations are not within the United States as defined by the Act (section 602(23)) and the regulation, these routing numbers have been deleted from Appendix A." Regulation CC; Availability of Funds and Collection of Checks, 53 Fed. Reg. 19372, 19390 (May 27, 1988) (12 CFR Part 229).

Another example of Guam banks not falling within the Act is found in the provision on government checks which applies to checks drawn by a "State," 12 U.S.C. § 4002(a)(2). There is a specific provision for the extension of time periods for any deposit in an account at a depository institution located in Alaska, Hawaii, Puerto Rico or the Virgin Islands (but not Guam) and deposited by a check drawn on an originating depository institution not located in the same State, commonwealth, or territory as the receiving depository institution. 12 U.S.C. § 4002(d)(2). This section directs that

> Notwithstanding any other provision of law, any time period established under subsection (b), (c), or (e) of this section shall be

6

extended by 1 business day in the case of any deposit which is
both--

**(A)** deposited in an account at a depository institution which is
located in Alaska, Hawaii, Puerto Rico, or the Virgin Islands; and

**(B)** deposited by a check drawn on an originating depository
institution which is not located in the same State, commonwealth,
or territory as the receiving depository institution.

Subsection (b) governs the availability of funds deposited "in an account at a depository

institution." *See, e.g.,* 12 U.S.C. § 4002(b)(1)-(4) (each subsection referring to funds deposited

"in an account at a depository institution"). If the EFAA had included banks in Samoa, Guam,

or the Northern Mariana Islands, that is, if banks in these jurisdictions were "depository

institutions," then Congress would have provided for a similar, if not longer, extension for

making funds available by banks in these jurisdictions. But they were clearly not.[2]

The provisions in the EFAA regarding "state law" also appear to be limited to states as

defined in the EFAA:

(a) In general

Any law or regulation of any State in effect on September 1, 1989, which
requires that funds deposited or received for deposit in an account at a
depository institution chartered by such State be made available for

_____

[2] The legislative history on this extension is sparse, the Conference Report merely
stating that:

Section 603(d)(2) specifically provides for a one day extension of the
schedules for any deposit in an account at a depository institution in
Alaska, Hawaii, Puerto Rico, or the Virgin Islands for checks drawn on
institutions located outside of those states, commonwealths or territories.

H.R. Conf. Rep. 100-261, at 179 (July 31,1987), *reprinted in* 1987 U.S.C.C.A.N. 588, 648.

The intent is clear. For "depository institutions" in noncontiguous jurisdictions, there
would be a one day extension.

7

withdrawal in a shorter period of time than the period of time provided in this chapter or in regulations prescribed by the Board under this chapter (as in effect on September 1, 1989) shall--

**(1)** supersede the provisions of this chapter and any regulations by the Board to the extent such provisions relate to the time by which funds deposited or received for deposit in an account shall be available for withdrawal; and

**(2)** apply to all federally insured depository institutions located within such State.

(b) Override of certain State laws

Except as provided in subsection (a) of this section, this chapter and regulations prescribed under this chapter shall supersede any provision of the law of any State, including the Uniform Commercial Code as in effect in such State, which is inconsistent with this chapter or such regulations.

12 U.S.C. § 4007.

Under the definitions of the EFAA, the Act overrides only "State" laws, the definition of "State" being very clear. If the Act had been intended to apply to Guam or Samoa or the Northern Mariana Islands, then it surely would have provided for the preemption of the laws of those jurisdictions.

It also appears that the EFAA was extended to the Virgin Islands and Puerto Rico through the efforts of the representatives from those jurisdictions. Representative De Lugo, of the Virgin Islands, stated:

Mr. DE LUGO. Mr. Chairman, the Expedited Funds Availability Act may be one of the best consumer protection bills to come before the Congress in many, many years. As an original cosponsor of H.R. 2443, I believe that passage of this bill will provide an equitable solution for consumers who have been victimized by unreasonable "check-holding" on deposited funds.

I would also like to commend Chairman ST GERMAIN for his lead on this complex issue, and his determination to see that the needs of

8

> consumers and depository institutions were balanced-so that adequate
> protective measures would be provided to both. Additionally, special
> thanks must be extended to my friend and colleague, Representative
> ROBERT GARCIA, *who saw that an amendment I requested was*
> *included to extend all of the consumer benefits in this legislation to*
> *residents of the U.S. Virgin Islands and the Commonwealth of Puerto*
> *Rico.*

132 Cong. Rec. H72-03 (daily ed. Jan, 23, 1986) (statement of Rep. De Lugo).

The Congressional representatives from Guam and American Samoa were not similarly successful. In 1995, recognizing that the Expedited Funds Availability Act did not extend to American Samoa and Guam, Congressman Faleomavaega of American Samoa and Congressman Underwood of Guam introduced Bill No. 1800 "to include the U.S. territories of American Samoa and Guam into the Expedited Funds Availability Act." 141 Cong. Rec. H5738-02, 1995 WL 340515 (daily ed. June 8, 1995) (statement of Rep. Faleomavaega). The Bill was never passed into law, but it is instructive to note that, in introducing the Bill with Congressman Underwood, Congressman Faleomavaega stated that:

> Mr. Speaker, for as long as I have been doing my banking in
> American Samoa, getting access to funds represented by checks drawn on
> banks outside of American Samoa has taken literally weeks. Banking
> customers throughout the United States had similar problems, and in
> response Congress passed the Expedited Funds Availability Act in 1987.
> ***The 50 States, the District of Columbia, the Commonwealth of Puerto***
> ***Rico, and the U.S. Virgin Islands were included in the act, but the***
> ***territories of Guam and American Samoa were not.*** (Emphasis supplied)

141 Cong. Rec. H5738-02.[3]

---

[3]     Bill No. 1800 provided that:

Be it enacted by the Senate and House of Representatives of the United
States of America in Congress assembled, That the Expedited Funds
Availability Act (12 U.S.C. 4001 et seq.) is amended-
    (1) in section 602(20) (12 U.S.C. 4001(20)) by inserting "located in
the United States," after "ATM";

9

Because the EFAA does not apply to banks in Guam, the First Claim for Relief in the

Complaint, which alleges a violation of the Act, fails to state a claim upon which relief can be

granted and should be dismissed.

**B.      This Court Continues To Have Jurisdiction Even After Dismissal of EFAA Claims.**

In the Complaint the Plaintiff predicates federal subject matter jurisdiction on the EFAA,

*see* Complaint, ¶¶ 1-2,[4/] and, for his common law claims, on the supplemental jurisdiction of this

---

> (2) in section 602(21) (12 U.S.C. 4001(21)) **[definition of "State"]**
> by inserting "Guam, American Samoa," after "Puerto Rico,";
>
> (3) in section 602(23) (12 U.S.C. 4001(23)) **[definition of United
> States"]** by inserting "Guam, American Samoa," after "Puerto Rico,"; and
>
> (4) by adding at the end of section 603(d) (12 U.S.C. 4002(d)) the
> following new paragraph:
>
> "(3) EXTENSION FOR CERTAIN DEPOSITS IN GUAM AND
> AMERICAN SAMOA.- Notwithstanding any other provision of law, any
> time period established under subsection (b), (c), or (e) shall be extended
> by 2 business days in the case of any deposit which is both-
>
>> "(A) deposited in an account at a depository institution which is
>> located in Guam or American Samoa; and
>>
>> "(B) deposited by a check drawn on an originating depository
>> institution which is not located in the same State as the receiving
>> depository institution."

141 Cong. Rec. H5738-02.

[4/]      Plaintiff's citation to 12 U.S.C. § 4007(b) as the basis for subject matter
jurisdiction, *see* Complaint, ¶ 2, is puzzling. This section pertains to the preemption of State laws
that are inconsistent with the Act or regulations promulgated under the Act. Plaintiff presumably
meant to refer to 12 U.S.C. § 1010(d) which provides that "[a]ny action under this section may
be brought in any United States district court, or in any other court of competent jurisdiction,
within one year after the date of the occurrence of the violation involved." Although the Plaintiff
also cites the general federal question jurisdiction statute, 28 U.S.C. § 1331, it is clear from the
complaint that plaintiff is asserting federal question jurisdiction is based solely on the Expedited
Funds Availability Act.

10

Court, presumably under 28 U.S.C. § 1367(a). *See* Complaint, ¶ 1.[5/] If EFAA were the only

basis for federal question jurisdiction this Court would lose jurisdiction upon the dismissal of the

EFAA claim. The reason for this is that, under 28 U.S.C. § 1367(a), unless there is an initial basis

for federal jurisdiction in the first instance, there can be no supplemental jurisdiction over state

or territorial claims. *See Herman Family Revocable Trust v. Teddy Bear*, 254 F.3d 802, 805 (9th

Cir. 2001) (" supplemental jurisdiction may only be invoked when the district court has a hook

of original jurisdiction on which to hang it"); *Scott v. Pasadena Unified School* Dist., 306 F.3d

646, 664 (9th Cir. 2002) (finding lack of standing was a determination that district court lacked

subject matter jurisdiction, and thus court has no jurisdiction to retain supplemental jurisdiction

over state law claims), *cert. denied*, — S.Ct. — , 2003 WL 162376 (May 19, 2003); *Scarfo v.*

*Ginsberg*, 175 F.3d 957, 962 (11th Cir. 1999) (under 28 U.S.C. § 1367(a), "[t]he federal courts

of appeals . . . have uniformly held that once the district court determines that subject matter

jurisdiction over a plaintiff's federal claims does not exist, courts must dismiss a plaintiff's state

law claims"), *cert. denied*, 529 U.S. 1003, 120 S.Ct. 1267 (2000).

What the Complaint fails to note, however, is that this Court has jurisdiction over

Plaintiff's claims under Title 12 U.S.C. § 632, known as the Edge Act, which provides, in

relevant part, that:

> Notwithstanding any other provision of law, all suits of a civil
> nature at common law or in equity to which any corporation
> organized under the laws of the United States shall be a party,
> arising out of transactions involving international or foreign banking,
> or banking in a dependency or insular possession of the United
> States, or out of other international or foreign financial operations,
> either directly or through the agency, ownership, or control of
> branches or local institutions in dependencies or insular possessions
> of the United States or in foreign

---

[5/]     Plaintiff does not specifically cite this statute.

countries, shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits . . . .

Because Citibank is a corporation organized under the laws of the United States, if the claims in Plaintiff's complaint "aris[e] out of transactions involving . . . banking in a dependency or insular possession of the United States," then this Court has jurisdiction over the claims. That Guam is a dependency or insular possession for purposes of section 632 seems clear. *See First Federal Sav. and Loan Ass'n of Puerto Rico v. Ruiz De Jesus*, 644 F.2d 910, 912-13 (1st Cir. 1981) (Puerto Rico still considered dependency or insular possession under section 632 following amendments to national banking laws) and Courts have generally required that the bank transactions at issue arise from "traditional" banking activities, such as loan agreements, letters of credit, mortgage agreements, or payment and processing of drafts. *Conjugal Soc. of Composed of Juvenal Rosa v. Chicago Title Ins. Co.*, 690 F.2d 1, 4 (1st Cir. 1982) ("Section 632 reaches only traditional banking activities, not all cases in which a bank organized under federal law is a party"); *In re Lloyd's American Trust Fund Litigation*, 928 F.Supp. 333, 341 (S.D.N.Y. 1996) ("The test according to the authorities is the existence of 'traditional banking activitiies,' . . . or "that the banking aspect of the jurisdictional transaction must be legally significant in the case.'") (citations omitted). It has been held that wire transfers are traditional banking activities. *Nacional Financiera, S.N.C. v. The Chase Manhattan Bank, N.A.*, No. 00 CIV 1571 JSM, 2001 WL 327159, at *3 (S.D.N.Y. April 4, 2001) ("The wire agreement constitutes a traditional banking activity"); *Banco De La Provincia De Buenos Aires v. Baybank Boston N.A.*, 985 F. Supp. 364, 367 (S.D.N.Y. 1997) (action based on refusal to execute wire transfer request, jurisdiction under section 632, the lawsuit involving international banking transactions).

12

Under 12 U.S.C. § 632, the Court continues to have federal question jurisdiction even though Plaintiff's EFAA claim be dismissed.

## C. Plaintiff's Common Law Claims Fail To State Causes Of Action Upon Which Relief Can Be Granted.

Plaintiff's claims in his Second through Sixth Claims for Relief arise out of Citibank's alleged breach of its duty to execute Plaintiff's wire transfer requests. Of these claims for relief, the Second (negligence), Fourth (intentional infliction of emotional distress), Fifth (negligent misrepresentation), Sixth (interference with contract of business relations), clearly sound in tort. The Third Claim for Relief, breach of duty to act in good faith and fair dealing, would normally be considered a contract claim, but Plaintiff, in its Prayer for Relief, includes this claim as one of the claims for which it seeks punitive damages, which indicates that Plaintiff is advancing this claim as a tort claim as well.

Plaintiff's common law claims are all based on Citibank's alleged failure to promptly execute Plaintiff's applications for wire transfers of money and are, therefore, based on a purported contractual duty to execute the wire transfers. While it is true that a contractual obligation may create a legal duty and the breach of that duty may support an action in tort,

> conduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from principles of tort law. *Applied Equipment [Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th 503, 28 Cal.Rptr. 475, 869 P.2d 454 (Cal. 1994)], *supra*, 7 Cal.4th at p. 515, 28 Cal.Rptr.2d 475, 869 P.2d 454.) " ' "An omission to perform a contract obligation is never a tort unless that omission is also an omission of a legal duty." ' " (*Ibid.*, quoting *Jones v. Kelly* (1929) 208 Cal. 251, 255, 280 P. 942.)

*Erlich v. Menezes*, 981 P.2d 978, 983, 87 Cal.Rptr.2d 886, 891 (Cal. 1999); *see also, Stanford Ranch, Inc. v. Maryland Casualty Company*, 89 F.3d 618, 625 (9th Cir. 1996) ("If a claim is

13

dependent upon the existence of an underlying contract, the claim sounds in contract, as opposed to tort").

Plaintiff's **Second Claim For Relief** (negligence), **Fifth Claim for Relief** (negligent misrepresentation) and **Sixth Claim for Relief** (interference with contract or economic relations) are all based on the alleged breach of Citibank's purported contractual duty to promptly execute the wire transfer and damages, if any, are contractual and not in tort.

Plaintiff's seeks punitive damages for its **Third Claim for Relief** (breach of covenant of good faith and fair dealing) which indicates Plaintiff is advancing the Third Claim, at least in part, as a tort claim. A covenant of good faith and fair dealing is implicit in every contract, *Foley v. Interactive Data Corp.*, 765 P.2d 373, 389, 254 Cal.Rptr. 211, 227 (Cal. 1988), "The essence of the implied covenant is that neither party to a contract will do anything to injure the right of the other to receive the benefits of the contract." *Cates Construction, Inc. v. Talbot Partners*, 980 P.2d 407, 415, 86 Cal.Rptr.2d 855, 864 (Cal. 1999). "Because the covenant is a contract term, however, compensation for its breach has almost always been limited to contract rather than tort remedies." *Foley*, 765 P.2d at 389, 254 Cal.Rptr. at 227; *Cates*, 980 P.2d at 416, 86 Cal.Rptr.2d at 865 (noting that only exception to general rule arises where there has been a breach of the implied covenant in insurance cases); *Freeman & Mills, Inc. v. Belcher Oil Co.*, 900 P.2d 669, 675-76, 44 Cal. Rptr.2d 420, 426-27 (Cal. 1995); *see, e.g., Bronx Chrysler Plymouth, Inc. v. Chrysler Corp.*, 212 F. Supp.2d 233, 249 n.10 (S.D.N.Y. 2002) ("under both New York and Michigan law, the doctrine of good faith and fair dealing functions as a principle of contract interpretation, not as an independent cause of action sounding in tort").

The **Fourth Claim for Relief** (intentional infliction of emotional distress), is also based on Citibank's alleged breach of its duties under the purported contractual relationship and is defective on this basis alone, *see, Rodriguez v. International Business Machines*, 960 F.Supp. 227, 232 (N.D. Cal. 1997) ("emotional distress and punitive damages claimed by Plaintiff are not recoverable on a breach of contract claim"). It suffers two additional fatal infirmities. First, even if there were an independent cause of action founded on negligence, recovery for emotional distress is not available arising solely out of property damage and "a preexisting contractual relationship, without more, will not support a recovery for mental suffering where defendant's tortious conduct has resulted only in economic injury to the plaintiff." *Erlich v. Menezes*, 981 P.2d at 985, 87 Cal.Rptr.2d at 893. Second, the plaintiff in this case, Takai Enterprises, is some type of entity (it is not defined in the Complaint) having a president. *See* Complaint ¶ 7. Legal entities, as opposed to natural persons, have no emotions and cannot press claims for emotional distress. *See Dynamic Image Technologies, Inc. v. U.S.*, 221 F.3d 34, 37 n.2 (1st Cir. 2000) ("Because corporations, unlike natural person, have no emotions, they cannot press claims for intentional infliction of emotional distress").

With respect to Plaintiff's **Sixth Claim For Relief** (interference with contract or business relations), the Plaintiff's claim is again based on Citibank's alleged breach of its contract with the Plaintiff which allegedly resulted in some type of harm (not at all clear from the Complaint) to the Plaintiff's other business relations. Even assuming Citibank is liable for breach of contract, which it is not, Citibank is not liable in tort, although the breach caused the Plaintiff's business relations with a third party to be adversely affected. *See, for example, Quantum Associates, Inc. v. Symbol Technologies, Inc.*, No. C 01-02789 CRB, 2002 WL 1735356, at *1 (N.D. Cal. July

15

12, 2002) ("Plaintiff must also plead and prove that 'defendant's interference was wrongful by some measure beyond the fact of the interference itself.' . . . Moreover, the wrongful conduct, that is the acts interfering with the relationship, must be more than a breach of contract. . . . To hold otherwise "would be contrary to the cautious policy of the courts about extending tort remedies to ordinary commercial contracts." *Khoury v. Maly's of California, Inc.*, 17 Cal. Rptr.2d 708, 711-12 (Cal. Ct. App. 1993) ("The sole alleged conduct of respondent was the breach of the contract to supply the JPM products to appellant. The effect on appellant's customers (with whom respondent had no relations) and the damage to appellant's business were simply consequences of breach of contract. If a contract plaintiff could plead in a conclusory way that the defendant maliciously intended to drive the plaintiff out of business, the tort of interference with prospective business advantage would be routinely pleaded in breach of contract cases. . . . Allowing such conclusory pleading would be contrary to the cautious policy of the courts about extending tort remedies to ordinary commercial contracts").

Cases from other Circuits and jurisdictions are in accord. *See, for example, McNeill v. Security Ben. Life Ins. Co.*, 28 F.3d 891, 894 n.4 (8th Cir. 1994) (termination of contract "cannot be the basis for a claim of tortious interference because any adverse effect on their relations with policyholders is an incidental consequence of the alleged wrongful termination, not an independent basis for liability in tort"); *Glazer v. Chandler*, 200 A.2d 416, 418 (Pa. 1964) ("[W]here . . . the allegations and evidence only disclose that defendant beached his contracts with plaintiff and that as an incidental consequence thereof plaintiff's business relationship with third parties have been affected, an action lies only in contract for defendant's breaches, and the consequential damages recoverable, if any, may be adjudicated only in that action"); *Digital &*

*Analog Design Corp. v. North Supply Co.*, 540 N.E.2d 1358, 1368 (Ohio 1989) ("It is well established that 'though a breach of duty under a contract or lease necessarily interferes with the injured party's business relations with third parties, the injured party is limited to an action for breach of contract and may not recover in tort for business interference'") (citation omitted); *Cahaba Seafood, Inc. v. Central Bank of the South*, 567 So.2d 1304, 1306 (Ala. 1990) ("The tort of intentional inference with business relations was intended to provide a remedy for situations where a third party intentionally interferes with the relationship of two contracting parties, not as a remedy for situations where an allegedly breached contract between two parties . . . affects the relationship of one of the parties with a third party"); *Arntz Contracting Co. v. St. Paul Fire and Marine Ins. Co.*, 54 Cal. Rptr.2d 888, 896 (Cal. Ct. App. 1996) (holding that a breach of contract cannot constitute the wrongful conduct required for the tort of intentional interference with prospective economic advantage, stating that "[a] contracting party's unjustified failure or refusal to perform is a breach of contract, and cannot be transmuted into tort liability by claiming that the breach detrimentally affected the promisee's business"); *Cates Construction*, 980 P.2d at 423, & n. 17, 86 Cal.Rptr.2d at 873 & n.17.

The Sixth Claim for Relief also fails to state a claim upon which relief can be granted and should therefore be dismissed.

# IV.

## CONCLUSION

For the reasons set forth above, Citibank prays that the Complaint be dismissed based on

the plaintiff's failure to state causes of action upon which relief can be granted.


Respectfully submitted this 11th day of June, 2003.


**TEKER CIVILLE TORRES & TANG, PLLC**

By  **G. PATRICK CIVILLE**
*Attorneys for Defendant*
*Citibank, N.A.*

18

# CASES/AUTHORITIES

# (PURSUANT TO GR 4.1)

*Nacional Financiera, S.N.C. v. The Chase Manhattan Bank, N.A.*,
No. 00 CIV 1571 JSM, 2001 WL 327159, at *3  (S.D.N.Y. April 4, 2001)

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

NACIONAL FINANCIERA, S.N.C., Plaintiff,

v.

THE CHASE MANHATTAN BANK, N.A. and BANK OF
AMERICA, Defendants.

**No. 00 CIV 1571 JSM.**

April 4, 2001.

Charles Berry, Shaw Pittman, New York, for Plaintiff.

Manuel W. Gottlieb, J.P. Morgan Chase Legal Dep't, David
Chenkin, Zeichner Ellman & Krause LLP, New York, for
Defendants.

*OPINION and ORDER*

MARTIN, District J.

**\*1** Plaintiff Nacional Financiera, S.N.C. ("Nafin" or
"Plaintiff") brings this suit against The Chase Manhattan
Bank ("Chase") and Bank of America ("BofA")
(collectively "Defendants") as the result of an errant wire
transfer. On the present motion, Chase seeks to compel the
joinder of certain necessary parties, or, in the alternative, to
dismiss the complaint pursuant to Fed.R.Civ.P. 19. For the
following reasons, Chase's motion to compel joinder is
granted.

In 1999, Nafin, a Mexican bank, loaned $10 million worth
of credit to Triturados Basalticos S.A. ("Tribasa"), a
Mexican construction corporation. In order to satisfy this
debt, on December 7, 1999, Tribasa ordered Chase in
writing to wire-transfer $9,775,701.95 from Tribasa's Chase
account in New York to Nafin's account at Deutsche Bank,
also located in New York. Chase inadvertently transferred
the funds to Tribasa's account at BofA, which was located in
California. Chase promptly informed BofA of the error.
BofA proceeded to deposit the funds into its own account in
order to off-set a debt that was owed to it by Tribasa. The
BofA debt resulted from a loan transaction that BofA's
Mexican lending unit had entered into with Tribasa, in
which it, along with banks Deutsche Bank and Societe
Generale, extended $100 million worth of credit to Tribasa.
(Keen Aff. Ex. C at 39-40.) BofA subsequently refused to
return the mis-wired funds to Tribasa or Nafin, and Chase
refused to refund them for its negligent transfer.
Accordingly, in February 2000, Nafin brought this action
against Chase for breach of contract and negligence on the
theory that Nafin was a third party beneficiary to the wire
agreement, and against BofA for unjust enrichment and

conversion. Chase and BofA each asserted cross-claims
against one another. [FN1]

> FN1. Tribasa has apparently repaid $7 million of
> its debt to Nafin since this action was commenced.

On or about October 27, 2000, a group of plaintiffs lead by
Lipstick, Ltd. (the "Lipstick Petitioners") filed suit against
Chase and Tribasa in New York Supreme Court. The
Lipstick Petitioners, who consist of judgment creditors of
Tribasa and its related companies, claim a right to the
mis-wired funds on the theory that they stand in Tribasa's
shoes and can therefore recover the funds in order to satisfy
their outstanding money judgments. In addition, in
November 2000, Societe Generale served levies upon Chase
and BofA claiming a right to the funds. Chase argues that
failure to join the Lipstick Petitioners and Societe Generale
in the present action will expose it to the risk of incurring
inconsistent obligations, and that accordingly these
necessary parties should be joined forthwith. [FN2]

> FN2. In October 2000, the Lipstick Petitioners
> expressed interest in intervening in the present
> action. However, instead they commenced the state
> court action.

Rule 19(a) requires that a party must be joined in an action
if:

> (1) in the person's absence complete relief cannot be
> accorded among those already parties, or (2) the person
> claims an interest relating to the subject of the action and
> is so situated that the disposition of the action in the
> person's absence may (i) as a practical matter impair or
> impede the person's ability to protect that interest or (ii)
> leave any of the persons already parties subject to a
> substantial risk of incurring double, multiple, or otherwise
> inconsistent obligations by reason of the claimed interest.

**\*2** If a party is deemed necessary to the action, that party
shall be joined unless doing so will destroy subject matter
jurisdiction or is otherwise unfeasible.

The very purpose of the state court suit is to recover the
funds at issue in this litigation. Therefore, the Lipstick
Petitioners "claim[ ] an interest relating to the subject of the
action." In addition, whatever the merits of the Lipstick
Petitioners' claims, their suit exposes Chase to the risk of
inconsistent obligations were this Court to order relief that
differs from that ordered by the state judge. For example,
this Court could order Chase to repay the funds to Nafin as
the third party beneficiary of its agreement with Tribasa,
while the state judge might order Chase to pay the money
directly to Tribasa's judgment creditors. Moreover, BofA is
also threatened by inconsistent obligations because a victory
by the Lipstick Petitioners against Chase will undoubtedly
lead to a claim-over against BofA. Thus, while BofA might
be ordered to repay the funds to Nafin in this action, it could

Case 1:03-cv-00015   Document 5   Filed 06/11/2003   Page 26 of 38

incur a different obligation were Chase to implead it in the state action, as Chase apparently plans to do. Similarly, Societe Generale claims a right to the instant funds and its absence from this suit may hinder its ability to protect that right.

Therefore, the Lipstick Petitioners and Societe Generale are necessary parties, and they should be joined unless joinder will destroy the Court's subject matter jurisdiction. This action was originally brought as a diversity action, and adding the Lipstick Petitioners will destroy diversity jurisdiction.

Chase argues that this Court nevertheless has subject matter jurisdiction over the action pursuant to 21 U.S.C. § 632, which confers upon federal courts jurisdiction over suits arising from international banking transactions. Both Nafin and BofA dispute the applicability of Section 632 to the facts of this case.

Section 632 provides:

Notwithstanding any other provision of law, all suits of a civil nature at common law or in equity to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving international or foreign banking ... or out of other international or foreign financial operations, either directly or through the agency, ownership, or control of branches or local institutions in dependencies or insular possessions of the United States or in foreign countries, shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits ....

12 U.S.C. § 632.

Chase claims that the requirements of Section 632 are met because BofA is a national bank and because the claims at issue arise from an agreement between a Mexican corporation and a New York bank to wire funds that related to an underlying Mexican loan, and from BofA's assertion that under the terms of its international loan agreement with Tribasa it was entitled to retain the mis- wired funds in order to off-set Tribasa's indebtedness. BofA, on the other hand, asserts that the claims in this action arise from a simple wire agreement between Tribasa and Chase, in which funds that were supposed to be transferred from one New York account to another New York account were mistakenly sent to a California account. BofA argues that both the negligent transfer and BofA's right of set-off implicate standard state law issues, and do not properly arise from "transactions involving international or foreign banking."

*3 Resolution of these conflicting arguments necessarily depends upon how broadly one should construe the reach of Section 632. Courts have generally required that the bank

transactions at issue arise from "traditional" banking activities, such as loan agreements, letters of credit, mortgage agreements, or payment and processing of drafts. *See Conjugal Soc'y Composed of Juvenal Rosa v. Chicago Title Ins. Co.,* 690 F.2d 1, 4 (1st Cir.1982); *Ossandon v. Swiss Bank Corp.,* No. 87 Civ. 0991, 1988 WL 138124, at *1-2 (S.D.N.Y. Dec. 15, 1988); *Telecredit Serv. Ctr. v. First Nat'l Bank,* 679 F.Supp. 1101, 1103 (S.D.Fla.1988). The transaction must contain some foreign aspect, and where the national bank is not a central party to the underlying transaction, the suit must nevertheless expose it to the risk of liability. *Compare Wells Fargo Asia Ltd. v. Citibank, N.A.,* 936 F.2d 723 (2d Cir.1991), *with Corporacion Venezolana de Fomento v. Vintero Sales Corp.,* 629 F.2d 786, 791-92 (2d Cir.1980); *see also Lazard Freres & Co. v. First Nat'l Bank,* No. 91 Civ. 0628, 1991 WL 221087, at *2 (S.D.N.Y. Oct. 15, 1991); *Telecredit,* 679 F.Supp. at 1103-04.

For example, in *Corporacion Venezolana de Fomento v. Vintero Sales Corp.,* 629 F.2d 786, 791-93 (2d Cir.1980), the Second Circuit held that jurisdiction existed over a transaction involving a sale of ships by a Venezuelan company to a New York company, in which a national bank issued a letter of credit in the New York company's favor against the Venezuelan company's account and allegedly allowed drawdowns in error. The "traditional" banking activity was the issuance of the letter of credit and the accompanying wrongful drawdowns, and the transaction was appropriately "foreign" because the letter was issued against a Venezuelan company's New York bank account. The Court noted that because the national bank was exposed to liability in the action, it was "entitled to the protection offered by 12 U.S.C. § 632." *Id.* at 792.

Although courts require the existence of a traditional banking activity having some foreign flavor, Judge Sweet has noted that courts have applied Section 632 even where the issues in the case involve state law causes of action and contain only an "incidental connection to banking law." *In re Lloyd's Am. Trust Fund Litig.,* 928 F.Supp. 333, 340 (S.D.N.Y.1996). *See, e.g., Conjugal Soc'y,* 690 F.2d at 5 (tort claims arising from mortgage transaction). Thus, Judge Sweet found that Section 632 was satisfied where Lloyd's underwriters alleged that Citibank wrongfully administered trust fund assets contained in a New York account, even where the claims involved negligent fund administration and breach of fiduciary duty. *But see Bank of New York v. Bank of America,* 861 F.Supp. 225, 232-33 (S.D.N.Y.1994) (declining to exercise jurisdiction under Section 632 where only question was whether a contract had been formed in the context of a sale of loans).

*4 Here, there is no question that BofA is a national bank and that it is exposed to liability in this action based on its

retention of the misdirected funds. BofA deposited the funds into its own account under the belief that it had a right to do so in order to off-set Tribasa's debt, which was the result of a foreign loan by BofA's Mexican lending unit. Thus, the presence of BofA, together with the international loan transaction that triggered its liability, meets the plain language of Section 632.

Even if BofA had not engaged in a foreign banking transaction with Tribasa, but had simply deposited funds that it received in error, jurisdiction arguably exists based on the wire agreement between Nafin and Chase. The wire agreement constitutes a traditional banking activity, and although the wire transfer was executed domestically, both Tribasa and Nafin are Mexican corporations maintaining bank accounts in New York. This would appear to fulfill the "foreign banking" requirement of the statute.

In any event, the Court has original subject matter jurisdiction over this action under Section 632, and joinder of the Lipstick Petitioners is therefore both necessary and feasible. Nafin is hereby ordered to amend its complaint in order to join the state court plaintiffs. In addition, Nafin should join Societe Generale if it is subject to the jurisdiction of this Court. [FN3] Nafin's failure to join these parties will result in dismissal of its complaint for failure to join a necessary party.

> FN3. Societe Generale's amenability to service of process was not briefed, but the New York phonebook contains a listing for a New York office.

SO ORDERED.

2001 WL 327159, 2001 WL 327159 (S.D.N.Y.)

END OF DOCUMENT

*Quantum Associates, Inc. v. Symbol Technologies*, *Inc.*,
No. C 01-02789 CRB, 2002 WL 1735356, at  *1
(N.D. Cal. July 12, 2002)

Only the Westlaw citation is currently available.

United States District Court, N.D. California.

QUANTUM ASSOCIATES, INC., Plaintiff,
v.
SYMBOL TECHNOLOGIES, INC., Defendant.

**No. C 01-02789 CRB.**

July 12, 2002.

ORDER

BREYER, J.

*1 This lawsuit arises out of defendant's alleged breach of software consulting and development agreements. The Court previously granted defendant's motion to dismiss in part with leave to amend. Now before the Court is defendant's motion to dismiss the Seventh and Eighth Causes of Action in the First Amended Complaint. After carefully considering the papers filed by the parties, the Court concludes that oral argument is unnecessary, *see* Local Rule 7-1(b), and GRANTS defendant's motion to dismiss.

DISCUSSION

In the Seventh and Eighth Causes of Action plaintiff alleges defendant interfered with plaintiff's prospective economic relationship with Staples, Viking Freight Systems ("Viking"), and New England Motor Freight ("NEMF"). Defendant moves to dismiss these claims as the relate to the alleged interference with Viking and NEMF.

To succeed on its claims for interference with prospective economic advantage plaintiff must prove the following:

(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.

*Youst v. Longo,* 43 Cal.3d 64, 71 n. 6 (1987). Plaintiff must also plead and prove that "defendant's interference was wrongful by some measure beyond the fact of the interference itself." *Della Penna v. Toyota Motor Sales, U.S.A., Inc.,* 11 Cal.4th 376, 395 (1995). Moreover, the wrongful conduct, that is, the acts interfering with the relationship, must be more than a breach of contract. *See Khoury v. Maly's of California, Inc.,* 14 Cal.App. 4th 612, 618 (1993). To hold otherwise "would be contrary to the cautious policy of the courts about extending tort remedies

to ordinary commercial contracts." *Id.*

Plaintiff's interference with prospective economic relations claims fail because, with respect to the interference with Viking and NEMF, the only wrongful conduct identified in the First Amended Complaint is defendant's breach of its agreements with plaintiff. Plaintiff alleges that it lost the Viking and NEMF contracts "because [defendant] failed to timely perform its obligations under the Development Agreement." First Amended Complaint ¶ 47. Plaintiff then explains how defendant failed to perform its obligations: Defendant "failed to provide [plaintiff] with required data interfaces, a usable specification of reports that Staples wanted, or adequate communications bandwidth for maintenance in a timely manner." *Id.* This conduct "tied up all of [plaintiff's] limited resources and prevented work on other projects," including the proposed Viking and NEMF projects. Plaintiff also alleges that defendant's failure to pay plaintiff $250,000.00 it owes under the Consulting Agreement further restrained plaintiff's ability to enter into an economic relationship with Viking and NEMF. *Id.* The above conduct is wrongful only if it is a breach of defendant's agreements with plaintiff; absent the agreements, defendant had no legal obligation to, for example, provide data interfaces. Such conduct does not support plaintiff's claims for interference with prospective economic relationship.

*2 In *Khoury,* for example, the plaintiff retailer purchased a certain product exclusively from defendant supplier. When defendant refused to supply the product to plaintiff, plaintiff sued for defendant's interference with plaintiff's economic relationship with its customers. The court affirmed dismissal of the interference claim:

The sole alleged conduct of [the defendant] was the breach of contract to supply the ... products to plaintiff. The effect on [plaintiff's] customers (with whom defendant had no relations) and the damage to [plaintiff's] business were simply consequences of breach of contract. If a contract plaintiff could plead in a conclusory way that the defendant maliciously intended to drive the plaintiff out of business, the tort of interference with prospective business advantage would be routinely pleaded in breach of contract cases. Allowing such conclusory pleading would be contrary to the cautious policy of the courts about extending tort remedies to ordinary commercial contracts.

*Khoury,* 14 Cal.App. 4th at 618. Here, as in *Khoury,* all that plaintiff alleges is that defendant breached its agreements and as a consequence plaintiff's business was damaged. As such allegations are insufficient as a matter of law to state an interference claim, the Seventh and Eighth Cause of Action as they relate to Viking and NEMF must be dismissed.

CONCLUSION

For the foregoing reasons, defendant's motion to dismiss is GRANTED. Since the Court had previously granted plaintiff leave to amend, and since plaintiff does not contend that it could further amend its claims, the motion is granted without leave to amend.

IT IS SO ORDERED.

2002 WL 1735356 (N.D.Cal.)

END OF DOCUMENT

132 Cong. Rec. H72-03 (daily ed. Jan, 23, 1986)
(statement of Rep. De Lugo)

Congressional Record --- House of Representatives
Proceedings and Debates of the 99th Congress, Second Session
Thursday, January 23, 1986

EXPEDITED FUNDS AVAILABILITY ACT

Mr. PEPPER. Mr. Speaker, by direction of the Committee on Rules, I call up House
Resolution 357 and ask for its immediate consideration.

The Clerk read the resolution, as follows:

H. RES. 357

Resolved, That at any time after the adoption of this resolution the Speaker may,
pursuant to clause 1(b) of rule XXIII, declare the House resolved into the Committee of
the Whole House on the State of the Union for the consideration of the bill (H.R. 2443) to
limit the number of days a depository institution may restrict the availability of funds
which are deposited in any account, and the first reading of the bill shall be dispensed
with. After general debate, which shall be confined to the bill and shall continue not to
exceed one hour, to be equally divided and controlled by the chairman and ranking minority
member of the Committee on Banking, Finance and Urban Affairs, the bill shall be
considered for amendment under the five-minute rule. It shall be in order to consider the
amendment in the nature of a substitute recommended by the Committee on Banking, Finance
and Urban Affairs now printed in the bill as an original bill for the purpose of amendment
under the five-minute rule, each section of said substitute shall be considered as having
been read, and all points of order against said substitute for failure to comply with the
provisions of clause 5(a) of rule XXI are hereby waived. No amendments to said substitute
shall be in order except pro forma amendments for the purpose of debate and amendments
printed in the Congressional Record at least one legislative day prior to their
consideration. At the conclusion of the consideration of the bill for amendment, the
Committee shall rise and report the bill to the House with such amendments as may have
been adopted, and any Member may demand a separate vote in the House on any amendment
adopted in the Committee of the Whole to the bill or to the committee amendment in the
nature of a substitute. The previous question shall be considered as ordered on the bill
and amendments thereto to final passage without intervening motion except one motion to
recommit with or without instructions.

The SPEAKER pro tempore (Mr. DANIEL). The gentleman from Florida <Mr. PEPPER> is
recognized for 1 hour.

Mr. PEPPER. Mr. Speaker, I yield 30 minutes to my friend, the able gentleman from
Missouri <Mr. TAYLOR>, and pending that, I yield myself such time as I may consume.

(Mr. PEPPER asked and was given permission to revise and extend his remarks.)

Mr. PEPPER. Mr. Speaker, House Resolution No. 357 is an open rule providing for the
consideration of H.R. 2443, the Expedited Funds Availability Act.

The rule provides for 1 hour of general debate to be equally divided and controlled by
the chairman and the ranking minority member of the Banking, Finance and Urban Affairs
Committee. The rule makes in order the Banking Committee amendment in the nature of a
substitute now printed in the bill as the original text for purposes of amendment. The
substitute will be considered by sections, and each section will be considered as having
been read.

Mr. Speaker, the rule waives clause 5(a) of rule XXI which prohibits appropriations in

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

First of all, it requires reports from the Federal Reserve to the Committee on Banking, Finance and Urban Affairs as to how this schedule is working. If there are some problems with the schedule, we will get reports on it and promise some recommendations on how to change it.

But just as important, the bill calls for a payment system advisory council. This is important because here representatives from the industry, as well as the regulatory agencies, will be able to come together and see if we cannot perfect a better way to collect checks. So this, I think, is one of the safeguards that consumers, as well as the banking institutions, will have as a protection by this bill.

Mr. LEHMAN of California. Mr. Chairman, I rise in support of H.R. 2443, the Expedited Funds Availability Act.

H.R. 2443 is carefully crafted legislation which is designed to end one of the most abusive practices known to the banking industry and consumers alike- the check float.

The bill as approved by the House Banking Committee provides for a reasonable hold schedule that is to be implemented over a 3-year period and is consistent with check hold schedules that have already been adopted by a number of States.

Furthermore, this legislation obligates depository institutions to disclose their hold policies and end much of the consumer confusion and frustration associated with this problem.

The Federal Reserve Board estimates the 99 percent of all checks are cleared within 1 or 2 business days; there is no justification for the wide discrepancies and often lenghty check hold policies of financial institutions across the country. If depository institutions have access to use these funds, so should the institutions' customers.

H.R. 2443, while forcing depository institutions to adhere to a strict check hold schedule, also grants the Federal Reserve the neccessary authority to provide safeguards against any check-related fraud or losses due to bankruptcy. Any efforts to weaken these safeguards or give banks the discretionary authority to exercise its own judgement would only open a loophole that helped create the check hold problem in the first place.

Passage of this important legislation will provide some relief for consumers and help alleviate some of the frustration associated with check holds, such as overdraft charges and late penalties charged for checks returned because of unknown hold policies.

I urge my colleagues to join me in supporting this legislation and finally put an end to this unfair practice.

Mr. DE LUGO. Mr. Chairman, the Expedited Funds Availability Act may be one of the best consumer protection bills to come before the Congress in many, many years. As an original cosponsor of H.R. 2443, I believe that passage of this bill will provide an equitable solution for consumers who have been victimized by unreasonable "check-holding" on deposited funds.

I would also like to commend Chairman ST GERMAIN for his lead on this complex issue, and his determination to see that the needs of consumers and depository institutions were balanced-so that adequate protective measures would be provided to both. Additionally, special thanks must be extended to my friend and colleague, Representative ROBERT GARCIA, who saw that an amendment I requested was included to extend all of the consumer benefits in this legislation to residents of the U.S. Virgin Islands and the Commonwealth of Puerto Rico.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

The need for this legislation has become evident through continuous reports of abuse, increasing over the past several years, that have been received from across the country. Perhaps the saddest instances concern the poor and the elderly who, often living on fixed incomes, have had checks written in good faith returned because of an unreasonable hold on a check that more often than not was issued by the U.S. Federal Treasury.

Although the banking industry maintains that H.R. 2443 will increase institutional losses as a result of the shortened period in which a bank can " hold" a depositor's access to funds, the irrefutable fact remains that banks do not often lose money on returned checks. According to a recent Bank Administration Institute study, it is estimated that banks actually earn $3.4 billion annually from charges imposed in connection with returned checks. Furthermore, H.R. 2443 provides the Federal Reserve Board with the authority to suspend application of these time limits for 45 days, on any classification of checks with unacceptable levels of loss which can be directly related to check availability schedules.

This is an issue where the Congress can take a stand in behalf of the American consumer. I think that it is time for us to do that now.

Mr. FRENZEL. Mr. Chairman, despite the lofty goals of H.R. 2443, the Expedited Funds Availability Act, I have concerns about the bill as reported out of the committee.

I don't deny that there is some showing of abuse. Some banks have unnecessarily held checks overlong. However, the incidence of needless delay, or abuse, is not great. H.R. 2443 may increase the incidence of NSF checks, causing those costs to be loaded on all the consumers who use the institution. Spreading the costs of deadbeats on the huge majority of bank-using consumers is not my idea of consumer protection.

I believe the bill could be greatly improved, and that consumers could be adequately protected if banks were allowed more discretion to hold checks under certain circumstances where they have reason to believe there was a real risk of noncollection. I understand an amendment will be offered by the gentleman from California <Mr. SHUMWAY> which would provide such discretion, and I support his efforts.

I also am concerned that the 6-day ceiling will become a floor. That, too, is not my idea of consumer protection. Sometimes, the urge to legislate needs to be resisted. This bill, after amendment, could be useful, but there are risks, and it is not the highest priority for the House.

Mr. WORTLEY. Mr. Chairman, today's legislation is about time-the time it takes to clear checks-in-town, out-of-town, travelers, cashiers', Government and payroll-those little slips of paper that mean so much to all of us.

H.R. 2443, the Expedited Funds Availability Act, sets uniform standards for the check clearing process. Wisely, Congress recognizes that a national payments system demands national standards. It's not fair that a depositor and his funds soon be parted in Indiana are not in New York. Financial services customers may have accounts in banks, thrifts and credit unions outside their home State. Varied and conflicting State laws only add to the general confusion. Time is ripe for a single straightforward national system.

Some of my colleagues may have heard from their home town bankers and thrift executives who are less than thrilled about this bill. They criticize this bill's timetable as impossible to meet. I disagree.

The bill states that within 3 years, there will be next day availability for in-State checks and 3 day availability for out-of-State checks. Depository institutions are

141 Cong. Rec. H5738-02, 1995 WL 340515
(daily ed. June 8, 1995)
(statement of Rep. Faleomavaega)

                Congressional Record --- House of Representatives
            Proceedings and Debates of the 104th Congress, First Session
                            Thursday, June 8, 1995

       **\*H5738** INTRODUCTION OF LEGISLATION TO INCLUDE AMERICAN SAMOA AND GUAM INTO
                        THE EXPEDITED FUNDS AVAILABILITY ACT

   (Mr. FALEOMAVAEGA asked and was given permission to address the House for 1 minute and
to revise and extend his remarks.)

   Mr. FALEOMAVAEGA.

   Mr. Speaker, I rise today with my colleague the gentleman from Guam <Mr. UNDERWOOD>, to
introduce a bill to include the U.S. territories of American Samoa and Guam into the
Expedited Funds Availability Act.

   Mr. Speaker, for as long as I have been doing my banking in American Samoa, getting
access to funds represented by checks drawn on banks outside of American Samoa has taken
literally weeks. Banking customers throughout the United States had similar problems, and
in response Congress passed the Expedited Funds Availability Act in 1987. The 50 States,
the District of Columbia, the Commonwealth of Puerto Rico, and the U.S. Virgin Islands
were included in the act, but the territories of Guam and American Samoa were not.

   While Guam and American Samoa are still the most distant territories, billions of
dollars now move daily around the world at close to the speed of light.

   Mr. Speaker, thousands of years ago the Samoans and the Micronesians carried their
currency across vast expanses of open ocean in heroic voyages in wind- driven canoes made
of hollowed logs. I have sailed part of the Pacific Ocean in a double-hull Polynesian
voyaging canoe called the Hokuleian from Tahiti to Hawaii for 28 days, and I think I could
have carried my currency in stones from one port to another faster than funds are now
being made available by the Banks in American Samoa and Guam. This is the 95th year of
this country, and I hope the banks in the Pacific will enter this century before the rest
of us move on to the next one.

   I ask that a copy of the bill be printed in today's CONGRESSIONAL RECORD, and, Mr.
Speaker, I urge my colleagues to support this legislation.

                                    H.R.-

   Be it enacted by the Senate and House of Representatives of the United States of
America in Congress assembled, That the Expedited Funds Availability Act (12 U.S.C. 4001
et seq.) is amended-

   (1) in section 602(20) (12 U.S.C. 4001(20)) by inserting ", located in the United
States," after "ATM";

   (2) in section 602(21) (12 U.S.C. 4001(21)) by inserting "Guam, American Samoa," after
"Puerto Rico,";

   (3) in section 602(23) (12 U.S.C. 4001(23)) by inserting "Guam, American Samoa," after
"Puerto Rico,"; and

   (4) by adding at the end of section 603(d) (12 U.S.C. 4002(d)) the following new
paragraph:

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

"(3) EXTENSION FOR CERTAIN DEPOSITS IN GUAM AND AMERICAN SAMOA.- Notwithstanding any other provision of law, any time period established under subsection (b), (c), or (e) shall be extended by 2 business days in the case of any deposit which is both-

"(A) deposited in an account at a depository institution which is located in Guam or American Samoa; and

"(B) deposited by a check drawn on an originating depository institution which is not located in the same State as the receiving depository institution.".

141 Cong. Rec. H5738-02, 1995 WL 340515 (Cong.Rec.)

END OF DOCUMENT